UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


QUINCY A. WILLIAMS,

              Plaintiff,

v.                                    Case No. 3:16-cv-45-J-34JRK

O. SWAIN, et al.,

              Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff Quincy A. Williams, an inmate of the Florida penal system, initiated this action on January 15, 2016, by filing a Civil Rights Complaint (Doc. 1) pursuant to 42 U.S.C. § 1983. He filed an Amended Complaint (Doc. 23) on October 3, 2016, and a Second Amended Complaint (SAC; Doc. 40) on June 22, 2017. In the SAC, Williams names the following Defendants: (1) O. Swain;[1] (2) Jason Reeder; and (3) H. Lester Fernandez. He asserts that the Defendants violated his federal constitutional rights when Swain used excessive force against him on October 1, 2015, Reeder threatened him and failed to provide an adequate decontamination shower, and Fernandez failed to provide him protection after the incident. As relief, Williams seeks compensatory and punitive damages.

_____

[1] The Clerk is directed to change the docket to reflect Defendant's proper name: Shawn Swain.

This matter is before the Court on Defendants' Motion for Summary Judgment (Motion; Doc. 81) with exhibits (Def. Ex.; Docs. 81-1 through 81-9).[2] The Court advised Williams of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Summary Judgment Notice (Doc. 84); Order (Doc. 45). Williams responded and submitted exhibits (P. Ex.). See Declaration in Opposition to Defendants' Summary Judgment (Response; Doc. 97). Defendants' Motion is ripe for review.

---

[2] With the Court's permission, see Order (Doc. 86), the Defendants filed three digital video discs (videos) under seal, see Defendants' Exhibits to Be Filed under Seal (Doc. 88); Def. Exs. D; E.

## II. Plaintiff's Allegations

In his verified SAC,[3] Williams asserts that Swain violated his Eighth Amendment right when he: (1) sexually assaulted Williams by grabbing his neck and squeezing his scrotum "in a painful manner," SAC at 3; (2) entered the holding cell, and attempted to choke Williams and stomp Williams' feet with his boots, see id.; (3) sprayed Williams with chemical agents while Williams was handcuffed, non-threatening, and sitting on the floor, see id.; and (4) returned Williams to the holding cell instead of escorting him to a decontamination shower, see id. He also states that Reeder threatened him, and directed another officer to turn off the decontamination shower when he knew Williams still had chemical agents on his face and head. See id. at 3-4. He maintains that Fernandez failed to provide "any kind of protective measure to ensure his safety and well being" after the incident involving Swain. See id. at 4.

More specifically, Williams asserts that, while housed at Columbia Correctional Institution Annex (CCIA) on October 1, 2015, he notified Officer Young, at 9:30 a.m., that he needed his stored legal property due to an impending court deadline. See id. at 4-5.

---

[3] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [Plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [Plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

He states that Young failed to address the legal property issue, and instead notified Williams that inmates could not possess radio batteries. See id. at 5. According to Williams, he told Young that he wanted to see the applicable institutional rule before he relinquished his batteries, but Young reported the issue to Swain. See id. Williams avers that he told Swain he would relinquish the batteries when Swain directed him to submit to handcuffs. See id. Williams states that Swain told Young that Williams "was going on a 3 day strip." Id. He asserts that he submitted to handcuffs, and declared a psychological emergency when he heard voices suggesting he was "set up." Id. According to Williams, Swain advised him that he "was still going on strip," and Swain and other officers escorted him off the confinement wing and into the holding cell area. Id.

Next, Williams describes what transpired when he and the escorting officers entered the holding cell area.

> After being placed in the holding cell still in handcuffs, the officers started leaving the hallway, [and] Captain Swain heard me talking to the voices in my head and thought I had said something about him.
>
> Captain Swain then returned by himself and unlocked the cell door and walked in.
>
> He grabbed me around the neck and started choking me then hit and grabbed my scrotum and started squeezing causing pain.
>
> I then screamed for help and attempted to get out of his grasp of my scrotum.

He tried to stomp my feet with his boots causing me to fall down.

At that time I slid into the hallway away from him.

He came out and removed his chemical agents from his side and sprayed me saying inmate get up.

I said I could not get up, my ankle had swollen up and was hurting and I could not get up from the sitting position while handcuffed behind my back.

He sprayed the whole can on me, in my face and on the back of my head.

He then had another officer to help him get me back on my feet.

He then conducted a pat search of my body and instead of taking me to the shower [he] place[d] me back into the holding cell.

He said he had 20 minutes to get me into the shower ignoring my plea to get the gas off me because I felt like I could not breathe and that I was about to die. I was begging him.

The whole time I was on the floor I did not threaten him or attempt to harm him in any ma[nn]er nor was I any threat to myself or others. I was secured with handcuffs behind my back.

Once he allowed the camera man to turn on the camera he gave a speech then removed me from the holding cell.

My whole face and head was [sic] burning and I felt like I was on fire.

Once I was placed into the decontamination shower and the effect of the gas had me crying and emotionally disturbed.

Lt. Reeder cut the water off knowing I still had chemical agent[s] on me and said that if I don't stop crying he was going to gas me again.

Even though the water was turned back on I still had chemical agents on me on the back of my head from the excessive use of the gas.

Id. at 6-7 (enumeration omitted).

According to Williams, he saw a confinement nurse who advised him to use water on his eye. See id. at 7. He asserts that a mental health (MH) advisor placed him on self-harm observation status (SHOS). See id. However, all the SHOS cells were occupied, so officers placed him in a regular cell with an officer watching him. See id. He avers that Swain came to his cell door and harassed him later that same day, and stated that Williams would be "his bitch" if he went to jail. Id. According to Williams, Swain told him he has been "doing this" for twenty years, has "never been caught," and has friends and family from Lake Butler to Tallahassee, inferring that no one would prosecute him. Id. at 8.

Williams states that the Florida Department of Corrections (FDOC) transferred him to the Reception and Medical Center (RMC), and placed him in an SHOS cell. See id. An MH team interviewed him the next day, and inquired about his infected eye. See id. Williams maintains that the MH team failed to report the Swain incident to the warden. See id. Williams avers a nurse contacted the doctor about his vision issues (mucus discharge in his blood shot eye). See id. According to Williams, he experienced impaired vision for

three weeks. See id. He declares that he used antibiotic eye drops and "eye water" as well as prescribed pain pills for his swollen ankle. Id.

According to Williams, the FDOC next transferred him to the Crisis Stabilization Unit (CSU) at West RMC where he submitted a grievance which was approved and investigated. See id. He states that a nurse saw him about the "PREA [(Prison Rape Elimination Act)]," and placed him on protective management. Id. at 9. He maintains that RMC officers harassed him about his claims against Swain. See id. Nevertheless, he states that Dr. Lowe ("the psych doctor") saw him on Veterans Day, advised that he would be assigned to outpatient TCU, and that the FDOC would not return him to CCIA. Id. Despite this, Williams asserts that the FDOC transferred him back to CCIA (where Swain worked) the next week, and advised him that he would not be assigned to protective management. See id. According to Williams, he heard voices telling him that Swain would have him killed, and therefore, "panicked" and cut his wrists. Id. He declares that officers escorted him to the clinic to see MH doctors, who advised him that the FDOC should not have returned him to CCIA. See id. He asserts that the FDOC placed him on a one-on-one suicide watch, and transferred him the next day to SHOS at Union Correctional Institution (UCI). See id. He avers that an MH specialist saw him, and recommended long-term TCU. See id. According to Williams, the FDOC placed him in confinement pending

TCU, but after three weeks, the FDOC transferred him back to CCIA where Swain confronted him again. See id. at 10.

Williams states that "the institution inspector" saw him, took his statement, and advised him that he "doesn't have anything to do with transfers." Id. at 11. Williams maintains that Swain falsified documents and wrote a disciplinary report (DR) for refusing an order when he tried to conduct a pat down search. See id. According to Williams, he requested a witness (a female officer in the control booth) and the fixed wing camera footage. See id. He states that the DR team concluded that Williams failed to provide "enough information" to locate the witness, and that the camera evidence was not available after thirty days. Id. He declares that the DR team found him guilty and sentenced him to thirty days in disciplinary confinement. See id. He also maintains that the grievances he submitted at UCI and RMC were approved and forwarded to the Inspector General's Office for investigation. See id.

According to Williams, the FDOC failed to assign Williams to protective management, and ensure that he and Swain were separated during the PREA investigation. See id. at 11-12. He avers that Swain harassed and threatened him on a "different occasion" after the October 1, 2015 incident. See id. at 12. Williams also explains his injuries and treatment.

> As for the medical treatment, infection
> in eye which [a]ffected my long distance sight
> and mucus discharge out of right eye, was

8

> treated with antibiotic eye drops, then long
> term eye water, which still left bad vision.
>
> Swollen ankles and neck burns that left
> sores in head and back of neck.
>
> And extension treatment with pain
> medications, mental health treatment with
> psychotic medication upgrade.

Id.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment
> remains unchanged. The language of subdivision
> (a) continues to require that there be no
> genuine dispute as to any material fact and
> that the movant be entitled to judgment as a
> matter of law. The amendments will not affect
> continuing development of the decisional law
> construing and applying these phrases.

reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## IV. Summary of the Arguments

In the Motion, Defendants maintain that (1) Defendant Swain is entitled to qualified immunity, <u>see</u> Motion at 5-9; (2) Williams fails to state Eighth Amendment claims against Defendants Reeder and Fernandez, <u>see</u> <u>id.</u> at 9-12; and (3) Williams is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injuries that are more than <u>de</u> <u>minimis</u>, resulting from Defendants' acts and/or omissions, <u>see</u> <u>id.</u> at 12-16. In response to Defendants' Motion, Williams asserts that "[t]he Defendants are not entitled to summary judgment because there are genuine issues of material facts to be resolved." Response at 1. He states that Defendant Swain is not entitled to qualified immunity. <u>See</u> <u>id.</u> at 5-7. Additionally, he maintains that he suffered "more than <u>de</u> <u>minimis</u> physical injury and psychological harm" as a result of Defendants' actions and/or omissions. <u>Id.</u> at 9-10. He requests that the Court permit him to amend to "add the proper defendant in the failure to protect claim against [the] inspector general," <u>id.</u> at 7, and grant "partial summary judgment"

in his favor under Federal Rule of Civil Procedure 56(f)(1), <u>id.</u> at 11.

## V. Law

### A. Eighth Amendment

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law, and (2) such deprivation occurred under color of state law. <u>Salvato v. Miley</u>, 790 F.3d 1286, 1295 (11th Cir. 2015); <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citation omitted); <u>Richardson v. Johnson</u>, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted). Additionally, the Eleventh Circuit requires "'an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation' in § 1983 cases." <u>Rodriquez v. Sec'y, Dep't of Corr.</u>, 508 F.3d 611, 625 (11th Cir. 2007) (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986)). In the absence of a federal constitutional deprivation or violation of a federal right, a plaintiff cannot sustain a cause of action against the defendant.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of the inmates." <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994). It is "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate [that] violates the Eighth Amendment." <u>Id.</u> at 828

(citations omitted). The deliberate indifference standard requires
the plaintiff to demonstrate that the prison official "was
subjectively aware" of a risk of harm; mere negligence is not
sufficient. <u>Id.</u> at 829, 835-36.

> A prison official violates the Eighth
> Amendment "when a substantial risk of serious
> harm, <u>of which the official is subjectively
> aware</u>, exists and the official does not
> respond reasonably to the risk." <u>Carter v.
> Galloway</u>, 352 F.3d 1346, 1349 (11th Cir. 2003)
> (quotation marks omitted and alterations
> adopted) (emphasis added). To survive summary
> judgment on a failure-to-protect claim under
> the Eighth Amendment, "a plaintiff must
> produce sufficient evidence of (1) a
> substantial risk of serious harm; (2) the
> defendants' deliberate indifference to that
> risk; and (3) causation." <u>Goodman</u>, 718 F.3d at
> 1331 (quotation marks omitted).[5]

> "The second element—that [a prison official]
> evidenced a deliberate indifference to a
> serious risk that [a prisoner] would be
> injured—forms the crux of the matter at hand."
> <u>Id.</u> The prison official must "actually
> (subjectively) know[] that an inmate is facing
> a substantial risk of serious harm, yet
> disregard[] that known risk by failing to
> respond to it in an (objectively) reasonable
> manner." <u>Rodriquez v. Sec'y for Dep't of
> Corr.</u>, 508 F.3d 611, 617 (11th Cir. 2007).
> With regard to the subjective component of the
> defendant's actual knowledge, the defendant
> "must both be aware of facts from which the
> inference could be drawn that a substantial
> risk of serious harm exists, and he must also
> draw the inference." <u>Farmer</u>, 511 U.S. at 837,
> 114 S.Ct. at 1979.

> Moreover, this must be shown by "conduct that
> is more than gross negligence." <u>Townsend v.</u>

---

[5] <u>Goodman v. Kimbrough</u>, 718 F.3d 1325 (11th Cir. 2013).

> _Jefferson Cnty._, 601 F.3d 1152, 1158 (11th
> Cir. 2010). "[T]he deliberate indifference
> standard—and the subjective awareness required
> by it—is far more onerous than normal
> tort-based standards of conduct sounding in
> negligence: 'Merely negligent failure to
> protect an inmate from attack does not justify
> liability under [§] 1983.'" _Goodman_, 718 F.3d
> at 1332 (quoting _Brown v. Hughes_, 894 F.2d
> 1533, 1537 (11th Cir. 1990)).

_Losey v. Thompson_, 596 F. App'x 783, 788-89 (11th Cir. 2015).

Thus, to establish an Eighth Amendment violation based on deliberate indifference, an inmate must show that a prison official "actually (subjectively) knows that an inmate is facing a substantial risk of serious harm, yet disregards that known risk by failing to respond to it in an (objectively) reasonable manner." _Rodriquez_, 508 F.3d at 617 (citing _Farmer_, 511 U.S. at 837, 844) (footnote omitted). "The known risk of injury must be a 'strong likelihood, rather than a mere possibility' before a guard's failure to act can constitute deliberate indifference." _Brown v. Hughes_, 894 F. 2d 1533, 1537 (11th Cir. 1990).

Prison officials may avoid Eighth Amendment liability in one of three ways: (1) showing that they were not subjectively aware "of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) admitting awareness of "the underlying facts" of a substantial danger, but believing the danger was "insubstantial or nonexistent"; or (3) claiming they responded reasonably to a known substantial danger. _Rodriquez_, 508 F.3d at 617-18 (quoting _Farmer_,

511 U.S. at 844) (internal quotations omitted). To satisfy the subjective knowledge requirement, a plaintiff must show that a prison official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." <u>Farmer</u>, 511 U.S. at 837. Whether a prison official "had the requisite knowledge of a substantial risk is a <u>question of fact</u> subject to demonstration in the usual ways, including inference from the circumstantial evidence." <u>Rodriguez</u>, 508 F.3d at 617 (emphasis in original).

With respect to the appropriate analysis in an Eighth Amendment excessive use of force case, the Eleventh Circuit has explained.

> [O]ur core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In determining whether force was applied maliciously and sadistically, we look to five factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates[, as reasonably perceived by the responsible officials on the basis of facts known to them]..." <u>Campbell v. Sikes</u>, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations omitted).[6]

---

[6] <u>See</u> <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986).

<u>McKinney v. Sheriff</u>, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam). "When considering these factors, [courts] 'give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance.'" <u>Fennell v. Gilstrap</u>, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam) (quoting <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007)).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition <u>de minimis</u> uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." <u>Hudson v. McMillian</u>, 503 U.S. 1, 9-10 (1992) (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." <u>Id.</u> at 9 (citation omitted). Notably, a lack of serious injury is relevant to the Eighth Amendment inquiry. <u>See</u> <u>Smith v. Sec'y, Dep't of Corr.</u>, 524 F. App'x 511, 513 (11th Cir. 2013) (per curiam) (quoting <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 38 (2010) (per curiam)). The United States Supreme Court explained.

> "[T]he extent of injury suffered by an inmate
> is one factor that may suggest 'whether the
> use of force could plausibly have been thought
> necessary' in a particular situation." <u>Ibid.</u>
> (quoting <u>Whitley</u>, <u>supra</u>, at 321, 106 S.Ct.
> 1078).[7] The extent of injury may also provide
> some indication of the amount of force

---

[7] <u>Whitley v. Albers</u>, 475 U.S. 312 (1986).

applied. As we stated in <u>Hudson</u>, not "every
malevolent touch by a prison guard gives rise
to a federal cause of action." 503 U.S. at 9,
112 S.Ct. 995. "The Eighth Amendment's
prohibition of 'cruel and unusual' punishments
necessarily excludes from constitutional
recognition <u>de</u> <u>minimis</u> uses of physical force,
provided that the use of force is not of a
sort repugnant to the conscience of mankind."
<u>Id.</u>, at 9-10 (some internal quotation marks
omitted). An inmate who complains of a "'push
or shove'" that causes no discernible injury
almost certainly fails to state a valid
excessive force claim. <u>Id.</u>, at 9 (quoting
<u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir.
1973)).[8]

Injury and force, however, are only
imperfectly correlated, and it is the latter
that ultimately counts. An inmate who is
gratuitously beaten by guards does not lose
his ability to pursue an excessive force claim
merely because he has the good fortune to
escape without serious injury.

<u>Wilkins</u>, 559 U.S. at 37-38.

## B. Qualified Immunity

The Eleventh Circuit has stated:

The qualified-immunity defense reflects
an effort to balance "the need to hold public
officials accountable when they exercise power
irresponsibly and the need to shield officials
from harassment, distraction, and liability
when they perform their duties reasonably."
<u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129
S.Ct. 808, 172 L.Ed.2d 565 (2009). The
doctrine resolves this balance by protecting
government officials engaged in discretionary
functions and sued in their individual
capacities unless they violate "clearly

---

[8] <u>See</u> <u>Johnson</u>, 481 F.2d at 1033 ("Not every push or shove,
even if it may later seem unnecessary in the peace of a judge's
chambers, violates a prisoner's constitutional rights.").

established federal statutory or constitutional rights of which a reasonable person would have known." <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate. <u>See</u> <u>id.</u> To do that, [the plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [Plaintiff's] constitutional right and that

that right was "clearly established ... in
light of the specific context of the case, not
as a broad general proposition[,]" at the time
of Defendant officers' actions. <u>Saucier v.
Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150
L.Ed.2d 272 (2001), <u>overruled in part on other
grounds</u> by <u>Pearson</u>, 555 U.S. 223, 129 S.Ct.
808. We may decide these issues in either
order, but, to survive a qualified-immunity
defense, [the plaintiff] must satisfy both
showings. <u>Maddox</u>, 727 F.3d at 1120-21
(citation omitted).

<u>Jones v. Fransen</u>, 857 F.3d 843, 850-51 (11th Cir. 2017). The Court

recently instructed:

Because § 1983 "requires proof of an
affirmative causal connection between the
official's acts or omissions and the alleged
constitutional deprivation," <u>Zatler v.
Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986)
(per curiam) (citation omitted), each
defendant is entitled to an independent
qualified-immunity analysis as it relates to
his or her actions and omissions. So we must
be careful to evaluate a given defendant's
qualified-immunity claim, considering only the
actions and omissions in which that particular
defendant engaged.

<u>Alcocer v. Mills</u>, 906 F.3d 944, 951 (11th Cir. 2018).

**VI. Discussion**

**A. Defendant Shawn Swain**

Defendant Swain asserts that he is entitled to qualified

immunity. <u>See</u> Motion at 5-9. Williams maintains that Swain is not

entitled to qualified immunity. <u>See</u> Response at 5-7. Additionally,

Williams asks that the Court enter partial summary judgment in his

favor pursuant to Federal Rule of Civil Procedure 56(f)(1).[9] See id. at 1, 3, 5, 11. Under the doctrine of qualified immunity, Defendant Swain may assert that he is entitled to qualified immunity from claims for monetary damages in his individual capacity. It is undisputed that Defendant Swain was engaged in discretionary functions during the October 1, 2015 events at issue. To defeat qualified immunity with respect to Defendant Swain, Williams must show both that Swain committed a constitutional violation, and that the constitutional right violated was clearly established. As the Eleventh Circuit has instructed, the Court must "parse" the actions Swain undertook, and "address the evidence as it pertains solely to him." Alcocer, 906 F.3d at 952.

Swain submitted a declaration in support of his request for summary judgment. See Def. Ex. B, Declaration of Shawn Swain (Swain Decl.). He declares, in pertinent part:

> On October 1, 2015 I [was] shift Supervisor at Columbia CI. At around 9:00 AM, I conducted rounds of the dormitory which Plaintiff was housed in. During my rounds, I noticed that several inmates, one of which was Plaintiff, were not in compliance with the property storage requirements placed upon them in confinement. Based on identifying this issue, I ordered Off[ic]er Youngs[10] to conduct

---

[9] Federal Rule of Civil Procedure 56(f)(1) gives the Court the discretion to "grant summary judgment for a nonmovant" after providing notice to the opposing party.

[10] Williams refers to him as Officer Young. See SAC at 4-5.

rounds at a later time to determine if the individuals were later in compliance. I then left the area.

At around 9:45 AM on the same date, I was contacted about Plaintiff failing to comply with the property storage requirements. I then responded and located Plaintiff in a holding cell within his wing. I entered Plaintiff's holding cell and attempted to conduct a pat search on Plaintiff as he was going to be placed on property restriction due to his failure to comply with the Administrative Regulations. While I was conducting the pat search, Plaintiff lunged to the floor and crawled out into the breezeway area yelling. I ordered Plaintiff several times to return to the holding cell, but Plaintiff refused to comply.

Based on Plaintiff's failure to comply with my orders, I then broken [sic] the seal on the chemical agents canister on my belt and advised that if he continued to refuse, I would utilize force against him. Plaintiff continued to refuse, and as a result, I administered one continuous stream into Plaintiff's facial area. Plaintiff then became compliant and returned to the holding cell and allowed staff to conduct a pat search. After the use of force, I had no further interaction related to Plaintiff as to this incident.

As a result of the incident, I issued Plaintiff a Disciplinary Report based on his behavior. I also believe that Officer Youngs also issued Plaintiff a Disciplinary Report based on his behavior. It is my understanding that Plaintiff was later convicted of the Disciplinary Reports.

I did not utilize any additional force beyond what is described above. I also did not utilize force on Plaintiff to abuse or otherwise harm him. I utilized the minimal amount of force necessary to maintain care, custody, and control of Plaintiff.

Id. at 1-2 (enumeration omitted); Def. Ex. C at 6, Incident Report.

The FDOC MINS[11] Incident Report (MINS Report) described the incident as follows:

> On October 1st 2015 at approximately 0946 hours Captain Shawn Swain reports, while assigned as shift supervisor, he was attempting to conduct a pat search of inmate Williams, Quincy #340902 who was in the holding cell of N-dormitory. Inmate Williams was going to be placed on property restriction due to him refusing to properly secure his property and made statements that security staff would never find everything to take it. Once Captain Swain entered the holding cell and attempted to search inmate Williams he suddenly lunged on the floor and crawled out into the breezeway area yelling. Captain Swain ordered inmate Williams several times to go back into the holding cell and to allow staff to conduct a pat search to no avail. Captain Swain then broke the seal #2695825 on his MK-4 OC #AX-3 chemical agents and advised him that if he continued to refuse that he would administer chemical agents. Inmate Williams continued to refuse so Captain Swain administered one continuous stream into the facial area of inmate Williams. Chemical agents took immediate effect and inmate Williams complied with all verbal orders and went back into the holding cell and allowed staff to conduct a pat search. All force ceased at this time.

---

[11] The abbreviation or acronym "MINS" is not defined in the documents provided to the Court. Apparently, these reports are generated for the use of corrections officials and the Inspector General's Office after a use of force upon an inmate or a battery upon a correctional officer by an inmate.

Def. Ex. C at 11 (capitalization omitted). The MINS Report names Officers Tiffany Hudson and Christopher Hadley as witnesses to the incident involving Swain and Williams.[12] See id.

Williams maintains that the fixed wing video shows Swain's excessive use of chemical agents. See Response at 3-6. However, there is no video evidence of what transpired between Swain and Williams inside the holding cell. See id. at 2. The fixed wing video shows the following relevant sequence of events.[13] On October 1, 2015, at approximately 9:45 a.m., Swain and another officer escorted Williams past a control booth and through the gate to the holding cell area. See Def. Ex. D #2. Swain placed Williams in the holding cell, and did not enter the cell with Williams. See id. Instead, he closed the cell door, and started to walk away from the cell door. See id. Swain apparently changed his mind about departing from the holding cell area. See id. Instead, Swain took a swift step back towards the holding cell that housed Williams, and communicated with Williams through the cell door. See id. Swain again began to walk away from the cell door, but returned and entered the holding cell. See id. Swain was inside the holding cell with Williams for less than ten seconds. See id. The other officer

---

[12] The record does not contain these witness accounts.

[13] The sealed video (Def. Ex. D #2) shows Swain's use of chemical agents on Williams. It appears that the times in the upper lefthand corner are incorrect. However, other exhibits provide the correct times. See Def. Exs. B; C; E.

stood at the cell front and watched what transpired while Swain was inside the cell with Williams. See id. Williams (still handcuffed behind his back) slid out of the holding cell and stopped at the other officer's feet. See id. Swain and the other officer looked down at Williams who remained handcuffed behind his back and lying on the floor. See id. The other officer walked away, and exited the holding cell area, as Swain sprayed Williams with chemical agents. See id. Swain placed Williams inside the holding cell, and did not enter the cell with him. See id. The other officer returned, and they started to close the cell door. See id. The other officer walked away again, and Swain took Williams out of the holding cell. See id. Williams was handcuffed and crouched down on his knees. See id. The other officer reappeared with gloves, placed leg cuffs on Williams, and conducted a pat down search. See id. Swain and the other officer assisted Williams to his feet, and returned Williams to the holding cell. See id. An officer with a handheld camera arrived at the scene within five minutes. See id. The challenged encounter between Swain and Williams lasted less than three minutes from the time the officers initially placed Williams in the holding cell to when they returned Williams to the holding cell after the alleged assault inside the cell, the chemical spraying in the hallway, and the pat down search. See id. Williams started the decontamination shower at 9:58 a.m., less that fifteen minutes

after the last application of chemical agents at approximately 9:45 a.m.[14] See Def. Ex. C, Report of Force Used, at 2.

At deposition, Williams described Swain's alleged assaultive behavior on October 1, 2015.

> And when [Swain] was walking away [from the holding cell], he heard me talking to myself. I didn't say nothing to him, and he turned around, as if I had called and said something disrespectful to him, and he came straight back in the holding cell.
>
> . . . .
>
> And when he came in there, I had on shower slides, like, flip-flops.
>
> . . . .
>
> And I'm hand cuffed. I'm still hand cuffed behind my back. He never took the handcuffs off, and he grabbed me from behind my neck, and stuck his hands in my groin part and went to squeezing it.
>
> . . . .

---

[14] FDOC Rule 33-602.210 provides, in pertinent part:

> All inmates exposed to chemical agents shall be ordered to shower in cool water and change inner and outer garments **within 20 minutes from the last application of chemical agents**, unless there is a documentable emergency resulting in an extension of this time frame or unless the inmate refuses to participate in the decontamination process.

FLA. ADMIN. CODE r. 33-602.210(p)2 (emphasis added).

And, he went to stepping on my feet,
like, trying to mush my toes with his feet.

. . . .

He was inside the cell with me.

. . . .

[H]e tripped me down. I fell to the ground.

. . . .

And I slid out to keep him from stomping
me, instead of stomping me.

. . . .

And I slid out in the hallway, and at the
same time, he come behind me and told me to
get up.

I told him I couldn't. I was handcuffed
behind my back. I weighed almost 200 pounds.
He done twisted my ankle. It had swollen up
and everything, and he grabbed me and just
went to spraying me. He didn't even give me
the opportunity to even try to get up. He just
sprayed me.

Def. Ex. H, Deposition of Quincy A. Williams (P. Depo), at 34-36.[15]

Given the differences in Williams' and the officer's sworn

recollections, there remain genuine issues of material fact

surrounding the incident involving Swain and Williams. As such, the

Court will deny Defendants' Motion as to Swain's assertion that he

is entitled to qualified immunity. Additionally, in light of the

---

[15] For purposes of reference, the Court will cite the page
number assigned by the Court's electronic docketing system.

remaining genuine issues of material fact, Williams' request for summary judgment under Rule 56(f)(1) is due to be denied.[16]

## B. Defendant Jason Reeder

Williams asserts that Defendant Reeder directed another officer to turn off the decontamination shower when he knew Williams still had chemicals on his face and head. See SAC at 3-4. Additionally, he states that Reeder threatened to gas him again if he could not control his emotions. See id. Defendant Reeder maintains that Williams fails to state an Eighth Amendment claim against him. See Motion at 9, 11-12. In doing so, Reeder relies on his own declaration, see Notice of Filing Supplemental Declaration (Doc. 91), Declaration of Jason Reeder (Reeder Decl.), and the handheld video footage, see Def. Ex. E. Williams maintains that there are disputed material facts, and therefore, Reeder is not entitled to summary judgment. See Response at 2.

In his declaration, Reeder states, in pertinent part:

> [A]n incident occurred which involved a spontaneous use of force involving chemical agents. After the use of force was conducted, I was called, and Plaintiff was given a decontamination shower. During the decontamination shower, Plaintiff indicated that he was finished showering and as a result, I ordered that the water be turned off and Plaintiff be taken to medical.

---

[16] The Court notes that a request for affirmative relief is not properly made when simply included in a response to a motion. See Fed. R. Civ. P. 7(b); see also Rosenberg v. Gould, 554 F.3d 962, 965 (11th Cir. 2009) (quoting Posner v. Essex Ins. Co., 178 F.3d 1209, 1222 (11th Cir. 1999)).

> Plaintiff was then taken to medical and given an assessment. The assessment yielded that Plaintiff had not suffered any injuries because of the spontaneous use of force. Plaintiff was later placed in a confinement cell, and my interactions with Plaintiff ceased as related to this incident.

Reeder Decl. at 1.

According to the fixed wing video, <u>see</u> Def. Ex. D #1, and the handheld video, <u>see</u> Def. Ex. E, officers escorted Williams to the decontamination shower at 9:56 a.m., and placed him in the shower stall about one minute later. <u>See</u> <u>id.</u> Williams turned on the faucet at 9:58 a.m., and Reeder directed an officer to turn off the faucet almost four minutes later. <u>See</u> <u>id.</u> Officers escorted Williams to the medical clinic at 10:05 a.m., where he arrived at 10:06 a.m. <u>See</u> <u>id.</u> A nurse attended to Williams' medical needs, and an MH counselor addressed his mental health. <u>See</u> <u>id.</u> Officers escorted Williams to a confinement cell at 10:16 a.m. <u>See</u> <u>id.</u>

The handheld video footage shows that Reeder directed Williams, as he showered, to calm down and cease his disruptive behavior, but Williams repeatedly shouted "they tried to kill me." Def. Ex. E. Reeder told Williams to calm down because MH was "on the way." <u>Id.</u> After Williams showered for over three minutes, Reeder asked Williams twice if he felt "any relief," and directed him to answer the question. <u>Id.</u> When Williams failed to respond, Reeder directed an officer to turn off the shower. <u>See</u> <u>id.</u> The

shower lasted almost four minutes, and Williams continued to shout, "they tried to kill me." Id.

FDOC Rule 33.602.210 provides, in pertinent part:

> Any portion of the inmate's body exposed to or that came into contact with chemical agents, including the eyes, shall be flushed with water as soon as possible after application for at least approximately five (5) to ten (10) minutes or until the affected inmate experiences relief. The inmate should be advised by the officer in charge to avoid rubbing any irritated area with a cloth or towel. No oils, creams, or topical medications shall be applied to the inmate without approval of a member of the medical services staff.

FLA. ADMIN. CODE r. 33-602.210(p)8.b.

In his declaration, Reeder states: "[Williams] indicated that he was finished showering and as a result, I ordered that the water be turned off and [Williams] be taken to medical." Reeder Decl. at 1. At Williams' deposition, the following colloquy ensued:

> Q. What I'm saying is you made clear to Reeder that you wanted to continue to take a shower; is that correct –
>
> A. That's right.
>
> Q. – because you needed additional time to continue to shower?
>
> A. Okay. And then when I took a shower, I did tell him I thought I was through, but that stuff was still in my head.
>
> Q. Okay. Did you ever express to him again that you felt you needed to go back and take a further shower?

> A.   I didn't see him. I took it -- I was in -
>      - I took -- I washed it out of my head
>      then. I washed it out of my head then,
>      but I was still burning.

P. Depo at 103.

The video evidence is reliable. Indeed, Williams failed to respond to Reeder's question as to whether Williams felt any relief. However, it appears that Williams had not finished trying to rid his body of the chemicals, and Reeder became agitated with Williams' disruptive behavior and non-responsiveness. See Def. Ex. E; P. Depo at 43-45. When the shower was turned off, Williams insisted that he still had chemicals on him. See Def. Ex. E. At deposition, Williams asserted that he "still had gas caked up in the back of [his] head, and [his] eye was on fire[]" when officers returned him to a confinement cell. P. Depo at 51. Given the record, there remain genuine issues of material fact as to whether Reeder provided Williams with an adequate decontamination shower. When viewing the facts in the light most favorable to Williams, he apparently still had chemicals on him and exclaimed that he did. Therefore, Defendants' Motion as to Williams' Eighth Amendment claim against Reeder for prematurely cutting off the water in the decontamination shower is due to be denied.

Additionally, Williams states that Reeder threatened to gas him again if he could not control his emotions. See SAC at 3; P. Depo at 43. Such allegations do not state a claim of federal

constitutional dimension. <u>See</u> <u>Hernandez v. Fla. Dep't of Corr.</u>, 281

F. App'x 862, 866 (11th Cir. 2008) (per curiam) (citation omitted).

> "[M]ere threatening language and gestures of a
> custodial office[r] do not, even if true,
> amount to constitutional violations." <u>Coyle v.</u>
> <u>Hughes</u>, 436 F.Supp. 591, 593 (W.D. Okl[a].
> 1977). "Were a prisoner . . . entitled to a
> jury trial each time that he was threatened
> with violence by a prison guard, even though
> no injury resulted, the federal courts would
> be more burdened than ever with trials of
> prisoner suits . . . ." <u>Bolden v. Mandel</u>, 385
> F.Supp. 761, 764 (D. Md. 1974). <u>See</u> <u>Johnson v.</u>
> <u>Glick</u>, 481 F.2d 1028, 1033 n.7 (2d Cir. 1973)
> (the use of words, no matter how violent, does
> not comprise a section 1983 violation).

<u>McFadden v. Lucas</u>, 713 F.2d 143, 146 (5th Cir. 1983); <u>Bismark v.</u>

<u>Fisher</u>, 213 F. App'x 892, 897 (11th Cir. 2007). Thus, Defendants'

Motion as to Williams' Eighth Amendment claim against Reeder for

any alleged threats made to Williams during the decontamination

shower is due to be granted.

## C. Defendant Lester Fernandez

Williams asserts that Defendant Fernandez failed to provide "any kind of protective measure to ensure his safety and well being" after the October 1, 2015, alleged assault. See SAC at 4. Fernandez maintains that there are no genuine issues of material fact as to Williams' Eighth Amendment claims against him, and therefore, he is entitled to summary judgment. See Motion at 3, 17. In support of his position, Fernandez relies on his interrogatory responses, see Def. Ex. F, and his declaration, see Def. Ex. G, Declaration of Lester Fernandez (Fernandez Decl.). Williams states that he "should be entitled to amend or add the proper defendant in the failure to protect claim against [the] inspector general." Response at 7.

In his declaration, Fernandez declares, in pertinent part:

> My name is Lester Fernandez and I am currently employed by the Office of the Inspector General for the Florida Department of Corrections ("FDOC"). During October 2015 I was not employed by FDOC and was working as the Assistant Inspector General for investigations for the United States Department of Labor. My office was in Washington, D.C.
>
> As I was not working for FDOC, I do not have any knowledge related to the facts of this case. Nor did I investigate or have anyone within my current office investigate Plaintiff's allegations as related to this case.
>
> However, after a review of the records in this case, it appears that a use of force packet was completed by Colonel Shawn Swain based on

> an incident which occurred on October 1, 2015.
> The incident was investigated by the Inspector
> at Columbia Correctional Institution, Annex,
> and the use of force appears to be determined
> to have followed FDOC procedures related to
> uses of force. Based on this determination, it
> appears that no further investigation was
> conducted.

Fernandez Decl. at 1. Fernandez states he has been the FDOC

Inspector General since June 6, 2016. <u>See</u> Resp. Ex. F at 1.

First, Defendant Fernandez maintains that Williams fails to

state an Eighth Amendment claim against him because the FDOC hired

him on June 6, 2016, well after the October 1, 2015 incident

involving Swain. <u>See</u> Motion at 10. Indeed, Defendant Fernandez was

not working for the FDOC on October 1, 2015. <u>See</u> Fernandez Decl.;

Resp. Ex. F at 2. The FDOC hired Fernandez as the FDOC Inspector

General on June 6, 2016. <u>See</u> Resp. Ex. F at 1. Williams fails to

contest this assertion. Thus, Defendants' Motion as to Williams'

Eighth Amendment claim against Fernandez for any actions and/or

omissions prior to June 6, 2016, is due to be granted.

Next, Fernandez asserts that Williams fails to state an Eighth

Amendment claim against him because (1) the Inspector General's

Office does not have the authority to assign Williams to a

particular custody level, such as protective management, and

Williams' assertions were not further investigated because the CCIA

Institutional Inspector, on April 13, 2017, determined that the

October 1st use of force complied with the FDOC policies and

procedures. <u>See</u> Motion at 10. Williams maintains that Fernandez

should have placed him in protective management because the FDOC approved his grievances concerning the October 1, 2015 incident, and forwarded them to the Inspector General's Office for investigation. <u>See</u> P. Depo at 75, 98; SAC at 11. However, Dean Glisson, with the OIG UOF (Office of the Inspector General, Use of Force) conducted a "field inquiry" of the October 1, 2015 chemical spraying, and determined on April 13, 2017, that the use of force complied with FDOC rules and procedures. Def. Ex. C at 3. Notably, Williams asserts that the CCIA institutional inspector took his statement, and advised him that he does not "have anything to do with transfers." SAC at 11.

FDOC Rule 33-601.209 provides that the institutional classification team (ICT) "is responsible for making work, program, housing and inmate status decisions at a facility and for making other classification recommendations to the State Classification Office (SCO)." FLA. ADMIN. CODE r. 33-601.209(3). Williams acknowledges that the FDOC initially placed him in protective management at RMC, "but [he] had not seen anyone from ICT." SAC at 9. Fernandez, as the FDOC Inspector General, neither had the authority to recommend a particular custody level for Williams nor place him in protective management. The FDOC defines the investigative responsibilities of the Office of the Inspector General as follow:

> The Office of the Inspector General (OIG) is a statutorily created independent entity whose

mission is to detect and deter waste, fraud, abuse, and misconduct in Departmental programs and personnel, and to promote economy and efficiency in those programs. The OIG investigates both alleged violations of criminal laws and major departmental policy violations/F.A.C. violations committed by Departmental employees and also audits and inspects Departmental programs.

The Office of Inspector General vision is to enhance public trust by excelling in criminal and internal affairs investigations, contract systems analysis, internal audits and safety and risk management programs to achieve the highest level of customer satisfaction. Specifically, we strive to be a leader in cultivating a staff that is knowledgeable and innovative, and provides executive management with investigative and audit recommendations that are clear, objective, constructive, actionable and timely.

Our mission is to serve as an independent and objective inspection, audit, and investigative body to promote efficiency, effectiveness and economy in the Department of Corrections' programs and operations, and to prevent and detect crime, corruption, fraud, abuse, misconduct, gross mismanagement, and waste.

Florida Department of Corrections, Office of the Inspector General, http://dc.state.fl.us/ig/index.html. Thus, Defendants' Motion as to Williams' Eighth Amendment claim against Fernandez for any actions and/or omission on or after June 6, 2016, is due to be granted.

Additionally, Williams requests "to amend or add the proper defendant in the failure to protect claim against [Fernandez]." Response at 7. Preliminarily, the Court notes that a request for affirmative relief, such as a request for leave to amend a pleading, is not properly made when simply included in a response

to a motion. <u>See</u> Fed. R. Civ. P. 7(b); <u>see</u> <u>also</u> <u>Rosenberg</u>, 554 F.3d at 965 ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.") (quoting <u>Posner</u>, 178 F.3d at 1222).

Moreover, even if it were proper to include such a request in the Response, the request is otherwise due to be denied for failure to comply with Local Rules 3.01(a) and 3.01(g), United States District Court, Middle District of Florida (Local Rule(s)). Local Rule 3.01(a) requires a memorandum of legal authority in support of a request from the Court. <u>See</u> Local Rule 3.01(a). Local Rule 3.01(g) requires certification that the moving party has conferred with opposing counsel in a good faith effort to resolve the issue raised by the motion and advising the Court whether opposing counsel agrees to the relief requested. <u>See</u> Local Rule 3.01(g). In addition to these deficiencies under the Local Rules, the request in the Response also fails to satisfy the requirement that "[a] motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." <u>Long v. Satz</u>, 181 F.3d 1275, 1279 (11th Cir. 1999); <u>see</u> <u>also</u> <u>McGinley v. Fla. Dep't of Highway Safety and Motor Vehicles</u>, 438 F. App'x 754, 757 (11th Cir. 2011) (affirming denial of leave to amend where plaintiff did not set forth the substance of the proposed amendment); <u>United States ex. rel. Atkins v. McInteer</u>, 470 F.3d 1350, 1361-62 (11th Cir. 2006) (same). Thus, the Court will not

entertain Williams' request for relief included in the Response. Williams is advised that, if he wishes to pursue such relief, he is required to file an appropriate motion, in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court. Notably, any such motion would likely be due to be denied for undue delay given the age and procedural posture of the case.

### D. Physical Injury Requirement
### 42 U.S.C. § 1997e(e)

Next, the Court turns to Defendants' assertions that Williams is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injuries that are more than <u>de</u> <u>minimis</u>, resulting from Defendants' acts and/or omissions. <u>See</u> Motion at 12-16. In <u>Brooks v. Warden</u>, 800 F.3d 1295 (11th Cir. 2015), the Eleventh Circuit Court of Appeals addressed the availability of compensatory and punitive damages as well as nominal damages in suits brought by prisoners under § 1983. The Eleventh Circuit stated:

> [Plaintiff]'s claim, however, is further governed by the Prison Litigation Reform Act of 1995 [(PLRA)], Pub.L. No. 104-134, §§ 802-10, 110 Stat. 1321, 1366-77 (1996). The PLRA places substantial restrictions on the judicial relief that prisoners can seek, with the goal of "reduc[ing] the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints." <u>Al-Amin v. Smith</u>, 637 F.3d 1192, 1195 (11th Cir. 2011) (quoting <u>Napier v. Preslicka</u>, 314 F.3d 528, 531 (11th

Cir. 2002)). The section of the Act at issue here, 42 U.S.C. § 1997e(e), reads this way:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act....

> This Court has held that § 1997e(e) applies to all federal civil actions, including constitutional claims brought under § 1983. See Harris v. Garner (Harris II), 216 F.3d 970, 984-85 (11th Cir. 2000) (en banc)....

> In this case, [Plaintiff] did not allege any physical injury . . . . Nevertheless, he sought "compensatory . . . punitive, and nominal damages" from [Defendant]. **Under the statute and our caselaw, an incarcerated plaintiff cannot recover either compensatory or punitive damages for constitutional violations unless he can demonstrate a (more than de minimis) physical injury.** See Al-Amin, 637 F.3d at 1198 (punitive); Harris v. Garner (Harris I), 190 F.3d 1279, 1286 (11th Cir. 1999) (compensatory), reh'g en banc granted and opinion vacated, 197 F.3d 1059 (11th Cir. 1999), opinion reinstated in relevant part, 216 F.3d 970. However, we have never had the opportunity in a published opinion to settle the availability of nominal damages under the PLRA. We do today, and we hold that nothing in § 1997e(e) prevents a prisoner from recovering nominal damages for a constitutional violation without a showing of physical injury.

Brooks, 800 F.3d at 1307-08 (emphasis added).

To satisfy § 1997e(e), a prisoner must assert physical injury that is more than de minimis, but the injury does not need to be significant. See Thompson v. Sec'y, Fla. Dep't of Corr., 551 F.

App'x 555, 557 (11th Cir. 2014) (citation omitted); <u>Dixon v. Toole</u>, 225 F. App'x 797, 799 (11th Cir. 2007). Despite § 1997e(e)'s limitation, successful constitutional claimants who lack a physical injury may still recover nominal damages. <u>See</u> <u>Hughes v. Lott</u>, 350 F.3d 1157, 1162 (11th Cir. 2003) ("Nominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages."). Further, the Eleventh Circuit has instructed courts to dismiss an inmate's compensatory and punitive damages claims under § 1997e(e) without prejudice to allow an inmate to refile when and if the inmate is released. <u>See</u> <u>Harris v. Garner</u>, 216 F.3d 970, 980 (11th Cir. 2000).

Taking Williams' allegations as to his injuries as true, he asserts physical injuries that are greater than <u>de</u> <u>minimis</u>. The injuries Williams complains about are allegedly the result of Defendant Swain spraying Williams with chemical agents, and Defendant Reeder denying Williams a shower that fully decontaminated him. According to Williams, he suffered blurred vision, a swollen ankle, an infected eye, and head and neck sores. <u>See</u> SAC at 8, 12; P. Depo at 45, 48, 51, 54. A nurse saw Williams in the medical clinic within twenty minutes of the alleged assault. <u>See</u> Def. Ex. C at 4, Emergency Room Record; P. Ex. A at 2. The emergency room summary, states: "eye had blood shot from chemical agents[.] But eyes PEARL [(pupils equal and reacting to light)],

lungs clear, no SOB [(shortness of breath)] noted, has had shower[,] no bruising, bleeding, or deformity noted on body." Id. Additionally, the nurse noted that Williams had no identifiable injuries, and determined that neither treatment nor physician notification was necessary. See Def. Ex. C at 4-5. At 10:16 a.m., FDOC officers escorted Williams to a confinement cell. See Def. Exs. D; E.

In response to Defendants' Motion, Williams asserts that he suffered "permanent eye injuries." Response at 9. He states that his eye was discharging mucus, and therefore, he was prescribed antibiotic eye drops. See id. at 10. He describes a long-lasting eye injury with loss of long-distance eyesight. See id.; P. Exs. A; B. He submitted a medical record showing that the FDOC transported him by ambulance to RMC's urgent care clinic that evening. See P. Ex. A at 4. Additionally, on October 23rd, an RMC nurse addressed Williams' complaints of injury and pain allegedly resulting from the October 1, 2015 assault. See id. at 5, Diagram of Injury.

Williams' alleged eye injury, for which he sought medical treatment, crosses § 1997e(e)'s de minimis threshold. See Thompson, 551 F. App'x at 557 n.3 (describing an approach of asking whether the injury would require a free world person to visit an emergency room or doctor) (citing Luong v. Hatt, 979 F. Supp. 481, 486 (N.D. Tex. 1997) ("A physical injury is an observable or diagnosable medical condition requiring treatment by a medical care

40

professional. It is not a sore muscle, an aching back, a scratch,
an abrasion, a bruise, etc., which lasts even up to two or three
weeks.")). Thus, Defendants' Motion is due to be denied to the
extent that the Court finds Williams' request for compensatory and
punitive damages is not precluded under § 1997e(e) because he
alleges that he suffered physical injuries that are greater than de
minimis.

## VII. Appointment of Counsel

A plaintiff in a civil case has no constitutional right to
counsel.[17] A court may, however, pursuant to 28 U.S.C. § 1915(e)(1),
appoint counsel for an indigent plaintiff in exceptional
circumstances. See Bass v. Perrin, 170 F.3d 1312, 1320 (11th Cir.
1999). In determining whether to appoint counsel, a court may
consider the type and complexity of the case and whether the
plaintiff can adequately present his case. See Ulmer v. Chancellor,
691 F.2d 209, 213 (5th Cir. 1982); Smith v. Fla. Dep't of Corr.,
713 F.3d 1059, 1065 n.11 (11th Cir. 2013).

Given the nature of Williams' assertions, appointment of
counsel is warranted at this stage of the litigation. Therefore,
this case will be referred to the Jacksonville Division Civil Pro
Bono Appointment Program so that the designated deputy clerk of

---

[17] During the early stage of litigation, Williams filed a
request for the appointment of counsel. See Motion for Appointment
of Counsel (Doc. 34), filed February 24, 2017. The Court denied the
request on March 2, 2017. See Order (Doc. 36).

this Court may seek counsel to represent Williams. Due to the limited resources of the program and the economy's impact upon those resources, the process of finding counsel may take some time. Therefore, the Court will stay and administratively close the case for sixty (60) days to try to find counsel. Williams must await this Court's notification to him as to when counsel has been found to represent him.

Therefore, it is now

**ORDERED**:

1. Defendants' Motion for Summary Judgment (Doc. 81) is **GRANTED** as to Williams' Eighth Amendment claims against: (1) Defendant Reeder for any alleged threats made to Williams during his decontamination shower, and (3) Defendant Lester Fernandez. Otherwise, the Motion is **DENIED**.

2. The Clerk shall terminate Defendant Lester Fernandez and make the appropriate notation on the docket.

3. Plaintiff's request "to amend or add the proper defendant" as to his failure-to-protect claim against Fernandez, Response at 7, is **DENIED** without prejudice to his right to file an appropriate motion.

4. Plaintiff's request for partial summary judgment under Federal Rule of Civil Procedure 56(f)(1), <u>see</u> Response at 1, 3, 5, 11, is **DENIED.**

5.   This case is referred to the Jacksonville Division Civil Pro Bono Appointment Program so that the designated deputy clerk of this Court may seek counsel to represent Williams. This case is **STAYED for sixty (60) days**, and the Clerk is directed to administratively close the case and terminate any pending motions.

6.   The Clerk must provide a copy of this Order to the designated deputy clerk for the Jacksonville Division Civil Pro Bono Appointment Program.

7.   The final pretrial conference scheduled for April 22, 2019, is cancelled, and this case is removed from the May 6, 2019 trial term.

**DONE AND ORDERED** at Jacksonville, Florida, this 11th day of March, 2019.


MARCIA MORALES HOWARD
United States District Judge


sc 3/8
c:
Quincy A. Williams, FDOC #340902
Counsel of Record
Division Manager

43